UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACOB COLEMAN,

       Plaintiff,                         Civil Action No. 12-10809

v.                                 HON. MARK A. GOLDSMITH
                                 U.S. District Judge
                                 HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Jacob Coleman brings this action under 42 U.S.C. §405(g), challenging a final  decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment  be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

      On February 12, 2010, Plaintiff filed an application for DIB, alleging disability as of April 3, 2009 (Tr. 133-134).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on April 5, 2011 in Mount Pleasant, Michigan (Tr. 43).

Administrative Law Judge ("ALJ") Jessica Inouye presided.   Plaintiff, represented by John

Wildeboer, testified (Tr. 49-76), as did Vocational Expert ("VE") Donald Hecker (Tr. 76-82).

On April 15, 2011, ALJ Inouye found that Plaintiff was not disabled through his date last

insured ("DLI") of June 30, 2010 (Tr. 31-32).   On December 20, 2011, the Appeals Council

denied Plaintiff's request for review (Tr. 1-3).   Plaintiff filed suit in this Court on February

22, 2012.

## BACKGROUND FACTS

Plaintiff, born April 4, 1979, was 31 on the DLI of June 30, 2010 (Tr. 32, 133).   He

completed a GED (Tr. 149) and worked previously as a automotive detailer and laborer (Tr.

150).   His application for DIB alleges disability as a result of back problems,

gastroesophageal reflux disease ("GERD"), bipolar disorder, post traumatic stress disorder

("PTSD"), anxiety, trichotillomania[1], shoulder problems, and depression (Tr. 148).

### A.     Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by amending the alleged onset date*

*to December 31, 2008* (Tr. 45).

Plaintiff testified that he currently lived in a one-family dwelling with his fiancée,

their two-year-old daughter, and his fiancée's 11-year-old daughter (Tr. 50).   He stated that

he currently worked 20 hours each week at a greenhouse planting flowers (Tr. 51).   He stated

---

[1]

Trichotillomania is "an irresistible urge to pull out hair from [the] scalp, eyebrows or other
areas of [the] body." http://www.mayoclinic.com/health/trichotillomania/DS00895 (last
visited February 23, 2013).

that he it was difficult for him to interact with customers (Tr. 51), and that he became anxious and paranoid when in groups of people or out in public (Tr. 52). He stated that his anxiety occasionally obliged him to leave work early (Tr. 52). He alleged that he experienced two panic attacks each day, but was able to cope with his anxiety if he was alone (Tr. 53). He opined that even if he were allowed to work without customer interaction, anxiety would prevent him from working more than 20 hours a week (Tr. 53). He stated that he took Clonopin for anxiety (Tr. 53). He testified that his panic attacks were characterized by clammy hands, shortness of breath, and profuse sweating (Tr. 55), and that on most occasions, his condition improved within 20 minutes after he took Clonopin (Tr. 55-56). He noted that he had been previously assigned to a greenhouse position requiring him to interact with five to ten coworkers, stating that he "couldn't handle" working in tandem with others (Tr. 56). He stated that before quitting his earlier greenhouse job in April, 2009, he had been working 40 hours each week (Tr. 57).

Plaintiff opined that none of his previous jobs would allow him to work independently enough to avoid panic attacks (Tr. 58). He stated that he quit a job as an auto detailer after he was admitted for inpatient treatment following a suicide attempt (Tr. 58). The position required him to "shampoo carpets," degrease engines and wheel wells, and buff and wax the vehicle's exterior (Tr. 59). He testified that he quit a job in a steel factory as a laborer after injuring his thumb (Tr. 58). He also reported work at two oil change establishments, but left those positions when he moved (Tr. 59).

-3-

Plaintiff denied problems reading, writing, or calculating (Tr. 60). He stated that he lost his driver's license in 2002 after being convicted of an alcohol-related offense, and that his mother drove him to the hearing (Tr. 60). He reported that he relied on his financée for transportation (Tr. 61). He stated that he currently had medical insurance and received food stamps (Tr. 61). He alleged additional limitations as a result of depression, reporting that the condition made him antisocial, unmotivated and suicidal (Tr. 62). He acknowledged that he had been taking Zoloft for one month and that "it seem[ed] to be doing okay" (Tr. 62). He added that his paranoia caused sleep disturbances, and had become worse in the past month (Tr. 63). He denied medication side effects (Tr. 64).

Plaintiff also alleged that he had PTSD (Tr. 64). He stated that when he was 13, he discovered the body of his mother's boyfriend who had committed suicide (Tr. 64). He stated that he had been seeing a therapist once every two weeks for the past "two to three months" (Tr. 65). He stated that he had not been taking medication prior to an October, 2009 psychiatric hospitalization (Tr. 66). He denied current alcohol use (Tr. 66). He stated that on the four days each week that he did not work, he spent his time sitting at home (Tr. 66). He stated that his 11-year-old stepdaughter had cerebral palsy, noting that he helped her prepare to meet the bus each morning (Tr. 67). He stated that in addition to the 11-year-old step-daughter and two-year-old biological daughter, he had a 10-year-old daughter who stayed with him every weekend (Tr. 68). Noting that he lacked motivation, Plaintiff stated that his fiancée did most of the household chores and yard work (Tr. 69). He denied socializing with family or friends, noting that his social activity had "dwindled" in the past

-4-

two years (Tr. 70).  He acknowledged that he had recently volunteered his services for "kids day" at his trailer park (Tr. 70).  He testified that he had been jailed for 30 days for failing to make child support payments, and that he had been placed in the general prison population (Tr. 70-71).  Plaintiff stated that he generally lacked the motivation to shower, dress, or shave (Tr. 71).

In response to questioning by his attorney, Plaintiff reiterated that he lacked motivation, stating that he felt like staying in bed and watching movies (Tr. 72).  He reported that he managed to get up and go to work only because his fiancée prodded him (Tr. 72).  He opined that he would have difficulty motivating himself to go to work without his fiancée's urging (Tr. 73).  He reiterated that he experienced panic attacks and paranoia in public, noting that such attacks had cause him to walk out of restaurants (Tr. 73).  He stated that at least once a week  he experienced anxiety while working at the greenhouse(Tr. 74).  He testified that he did not receive therapy in 2009 due to lack of insurance coverage (Tr. 76).

### B. Medical Evidence[2]

## 1.  Treating Sources

In November, 2004, Plaintiff was admitted for a three-day inpatient psychiatric hospitalization after deliberately trying to crash his car (Tr. 421).  He tested positive for marijuana and cocaine use, but denied the use of cocaine, suggesting that someone  placed cocaine into one of his alcoholic drinks the day before (Tr. 421).  He was assigned a GAF

---

[2]Medical records not relevant to Plaintiff's claims of error have been reviewed in full, but are omitted from the present discussion.

of 25[3] (Tr. 426). He was discharged and released to return to full-time work two days after the discharge (Tr. 422). In February, 2005, Plaintiff reported that he last worked "in retail in January, 2005," adding that he also held jobs as an auto detailer, oil changer, and remodeling construction worker (Tr. 441). He reported a DUI in 2002 and that he had been sent to jail for back child support (Tr. 442). He was assigned a GAF of 45[4] (Tr. 445).

In January, 2007, Plaintiff stated that he had recently taken 15 to 20 Vicodin pills and written a suicide note, but his mother ignored the suicide note and drove him to work instead (Tr. 454). Inpatient treating records created by Behavioral Services for the Bay Regional Medical Center note Plaintiff's history of marijuana use (Tr. 272). Plaintiff denied past IV drug use (Tr. 272). Plaintiff was placed on Zyprexa, Valium, Thiamine, and Depakote during his hospitalization (Tr. 272). He denied the regular use of prescription psychotropic drugs (Tr. 272). Lawrence, Scalzo, D.O. diagnosed Plaintiff with depression (Tr. 273). Discharge notes from the same month state that Plaintiff was traumatized at the age of 12 by discovering the body of his mother's boyfriend (Tr. 274). Plaintiff stated that he had "nightmares and flashbacks in the past," but reported that those "symptoms . . . abated" (Tr. 274). Plaintiff reported multiple suicide attempts (Tr. 274). Plaintiff admitted to binge

---

[3]A GAF score in the range of 21-30 is associated with "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. " *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*" ) at 34 (4th ed.2000).

[4]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders* at 34 ("*DSM-IV-TR*")(4th ed.2000).

drinking occasionally, using marijuana one year ago, and using LSD as a teenager (Tr. 275).

He was assigned a GAF of 31-40 upon admission and a 41-50 four days later upon discharge[5]

(Tr. 275).  The same month, Holly Harrin completed a Mental Residual Functional Capacity

Assessment, finding that Plaintiff experienced uniformly marked limitations in memory,

concentration, social interaction, and adaption (Tr. 457).

In August, 2008, Plaintiff sought emergency treatment for "acute shoulder strain" and

a pinched nerve (Tr. 261).  Imaging studies were unremarkable (Tr. 309).  He was prescribed

Norflex, Toradol, and Ultram (Tr. 263).  In November, 2008, Plaintiff sought emergency

treatment for symptoms of GERD (Tr. 255-258).  In April, 2009, Plaintiff sought emergency

treatment for a sore throat (Tr. 241-254).

On October 22, 2009, Plaintiff was again admitted for inpatient treatment after stating

that he had recently tried to hang himself (Tr. 277, 287-288, 299).  At the time of admission,

he denied current homicidal or suicidal ideation, but stated that he had auditory and visual

hallucinations (Tr. 278).  Plaintiff was assigned a GAF of 35 upon admission (Tr. 285).  He

denied problems reading or writing (Tr. 297).  He reported working on cars as a hobby (Tr.

298).  He admitted to marijuana use once or twice a week (Tr. 300).  Imaging studies of the

left shoulder, thoracic spine, and lumbar spine were unremarkable (Tr. 305-306).  Progress

notes state that Plaintiff's depression was exacerbated by the use of opiates for back pain (Tr.

---

[5]

A GAF score of 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders* at 34 ("*DSM-IV-TR*")(4th ed.2000).

318).  Three days later, Plaintiff reported feeling "excellent" after being prescribed Klonopin (Tr. 279).  Group therapy was deemed inappropriate due to Plaintiff's anxiety in a group setting and problems focusing (Tr. 357).  Upon discharge on October 26, 2009, Plaintiff denied hallucinations or paranoia, reporting that he felt "excellent" (Tr. 316).  Group therapy notes from the same day state that Plaintiff participated in therapy, demonstrating goal-oriented speech and direct eye contact (Tr. 367).  Michael Ingram, M.D. noted that Plaintiff did not have insurance, but stated that he would try to obtain "samples" until Plaintiff received medication from a free clinic (Tr. 279).

In December, 2009, Michael Ingram, M.D. performed a medication review, observing that Plaintiff reported continued depression and anxiety but better self-esteem, despite having recently spending one month in jail for failure to make child support payments (Tr. 372).  Plaintiff's speech was "clear and coherent" and he was fully oriented (Tr. 372).

A February, 2010 psychiatric evaluation by M.H. Syed, M.D. noted that Plaintiff alleged anxiety and hallucinations but did not exhibit anxiety during the interview (Tr. 378).  Dr. Syed noted that despite allegations of hallucinations, "[n]o delusional thinking was expressed" (Tr. 378).  Plaintiff denied current drug use, but stated he experimented with marijuana once as a teenager (Tr. 377).  Plaintiff stated that he was currently being supported by his girlfriend's Social Security payments, noting that he had recently applied for DIB benefits (Tr. 377).  Dr. Syed assigned Plaintiff a GAF of 40 (Tr. 378).  The same month, counselor Sally Glowwicki found that Plaintiff was currently experiencing visual and

auditory hallucinations and experienced "high irritability, impulsivity, and rage" (Tr. 387). Plaintiff failed to show for two counseling sessions in February, 2010 (Tr. 394-395).

In March, 2010, Dr. Syed noted that Plaintiff was "fairly calm and relaxed" and "did not show evidence of [a] thought disorder" (Tr. 399). Plaintiff reported that he was attempting to overcome his social anxiety by volunteering for children's activities in his trailer park (Tr. 399). In June, 2010, Plaintiff told Dr. Syed that progress had been poor due to nightmares and daytime anxiety (Tr. 479). The following month, Plaintiff stated that he had not attended Michigan Works, a job training program, because he experienced anxiety (Tr. 482). In September, 2010, Plaintiff reported that he would be able to "handle a job if he [were] by himself" (Tr. 485). In October, 2010, Plaintiff's new psychiatrist, Suma Cherukuri, D.O. noted that Plaintiff had been contacted by therapists on many occasions but had not returned their phone calls (Tr. 486-487). The following month, Plaintiff alleged paranoia and renewed hallucinations (Tr. 500). After missing several appointments, Plaintiff asked to go back on "meds" (Tr. 509).

In March, 2011, Suma Cherukuri, D.O., having treated Plaintiff since October, 2010, completed an assessment of Plaintiff's work-related abilities, finding moderate limitations in "following rules," relating to coworkers, and dealing with the public (Tr. 538). He found marked limitations in the use of judgment, dealing with stress, maintaining attention, and completing complex or detailed instructions (Tr. 538). He found further that Plaintiff experienced moderate limitations in daily living, and marked limitations in social functioning and maintaining concentration, persistence, and pace (Tr. 539). He found one to two episodes

-9-

of decompensation (Tr. 539). Dr. Cherukuri stated that he first treated Plaintiff in June, 2010 (Tr. 540).

## 2. Non-Treating Sources

A May, 2010 one-time physical examination by Scott Lazzara, M.D. on behalf of the SSA was unremarkable except for some tenderness in the "upper trapezius area" (Tr. 402-406). Plaintiff exhibited normal concentrational abilities and an intact immediate, recent, and remote memory (Tr. 405).

### C. Vocational Expert Testimony

VE Donald Hecker classified Plaintiff's former work as an auto detailer and laborer as exertionally medium and jobs as a horticulture worker as heavy[6] with a Specific Vocational Preparation ("SVP") of 2 (unskilled work)[7]  (Tr. 215).  The VE found that the lubrication servicer positions were exertionally medium and had an SVP of 4 (semiskilled work) (Tr. 79).  Assuming Plaintiff's age, education, and work background, the ALJ posed the following hypothetical question:

This individual would require work which is non-production oriented, simple,

─────────────────────

[6]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

[7]http://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html (last visited February 24, 2013).

-10-

> unskilled with an SVP: 1 or SVP: 2. This individual should not work in close
> proximity to coworkers, meaning the individual could not function as a
> member of a team. This individual should only have minimal and brief contact
> with the public. This individual should work in an essentially isolated position
> with occasional supervision. This individual can work around up to two
> people, other people could be on the work premises, but not in the near vicinity
> of where the individual is working. This individual should perform, can
> perform low stress work, meaning only occasional changes in the work
> environment and only occasional decision making. Can this hypothetical
> individual perform the claimant's past work? (Tr. 80).

The VE found that the above-limited individual could perform Plaintiff's past relevant work

as an auto detailer and general laborer (Tr. 80).

> The ALJ then added additional limitations to the original hypothetical question:

> [O]ne to two step tasks, assuming that these are not already included in my
> hypothetical, but I'll add them anyway. I'll add there's no interaction with the
> public . . . in an isolated type environment, only one or two people around,
> if necessary, this individual could receive assurances from supervision that the
> job was being performed right. So, I guess, not hovering supervision, but
> supervision available to double check work [at an interval of one to two
> hours]? (Tr. 80).

The VE responded that the individual could perform the job of auto detailer (Tr. 81). He

testified further that if the same individual were unable to work for more than 20 hours a

week due to psychological limitations, all full-time work would be precluded (Tr. 81).

In response to questioning by Plaintiff's attorney, the VE testified that if the above-

limited individual were unable to "maintain concentration, persistence, and pace required for

full time, competitive employment" for approximately 45 minutes each eight-hour workday,

he would be unable to perform any work (Tr. 81-82). The VE stated that her testimony was

consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 82 ).

### D.    The ALJ's Decision

Citing the medical evidence of record, ALJ Inouye found that while Plaintiff experienced the severe impairments of "history of polysubstance abuse in partial remission; depression; impulse control disorder; panic disorder with agoraphobia; and post-traumatic stress disorder," none of the conditions met or equaled an impairment listed in Appendix 1 Subpart P, Regulations No. 4. (Tr. 23-24).   The ALJ determined that Plaintiff experienced mild restriction in activities of daily living, marked difficulties in social functioning, and moderate deficiencies in concentration, persistence, or pace (Tr. 24).  The ALJ found that Plaintiff retained the following Residual Functional Capacity ("RFC") for a full range of work with the following additional work limitations:

> [N]on-production oriented, simple, unskilled, with an SVP of 1 or 2, and not in close proximity to co-workers (meaning the individual could not function as a member of a team); he was limited to 1 to 2 step tasks with no public interaction; he worked best in an isolated environment with only 1 to 2 people nearby at the most, but he needed assurance from supervision every 1 to 2 hours that he was performing his job correctly; and he required low-stress work, with only occasional changes in the work environment, and only occasional decision-making duties (Tr. 25).

Adopting the VE's job findings, the ALJ found that Plaintiff could perform his past relevant work as an auto detailer (Tr. 31).

The ALJ discounted Plaintiff's allegations of limitations, noting that he told Dr. Syed in September, 2010 that he could perform a job that allowed him to work in isolation (Tr. 27).  She acknowledged Plaintiff's subsequent testimony that he experienced panic attacks

even when working alone, but observed that this claim was unsupported by any medical evidence of record (Tr. 28). The ALJ found that Plaintiff's claims were also undermined by his inconsistent statements regarding his drug and alcohol use to various treating sources (Tr. 28).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

-13-

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff presents seven arguments in favor of remand.  First, he contends that the ALJ erred by declining to consider Dr. Cherukuri's March, 2011 assessment.  *Plaintiff's Brief* at 7-12, *Docket #10.*  Second, he argues that evidence created prior to the December 31, 2008 onset date**,** particularly the January, 2007 functional assessment by Holly Harrin, was improperly omitted from consideration.  *Id.* at 12-15.   Third, he contends that the ALJ's

-14-

finding that he made inconsistent statements to treating sources about his drug use relies on a misreading of the record. *Id.* at 15-20.

Plaintiff argues fourth that the ALJ improperly discounted the import of his low GAF scores. *Id.* at 20-24. Fifth, he states that the hypothetical question to the VE (and the essentially identical RFC) did not account for his moderate concentrational deficiencies. *Id.* at 24-29. In his sixth argument, Plaintiff revisits his third contention that the ALJ's credibility analysis was tainted by the ALJ's erroneous interpretation of the evidence, such as gaps in his mental health treatment and the failure to consider his financial constraints. *Id.* at 29-36. Seventh, he argues that his financée's assessment of his condition was unjustifiably discounted by the ALJ. *Id.* at 36-37.

 Plaintiff's first and second arguments pertain to evidence created either before or after the relevant time period of December 31, 2008 and June 30, 2010 and can be discussed in tandem. Likewise, the third and sixth arguments, pertaining to the weight given to Plaintiff's allegations, can be considered together. The arguments regarding the GAF scores (argument four); the hypothetical question/RFC (argument five) and the weight accorded his financée's testimony (argument seven) will be considered separately.

**A. Evidence Created Outside the Relevant Period**

**1. Dr. Cherukuri's March, 2011 Assessment**

Plaintiff argues that the ALJ erred by failing to address Dr. Cherukuri's finding of marked psychological limitations. *Plaintiff's Brief* at 7-12. Plaintiff notes that because Dr. Cherukuri was a treating source, her opinion was entitled to deference. *Id.* at 7-10. He faults

the ALJ's finding that because the March, 2011 assessment was written after the DLI, it was not relevant to whether he was disabled prior to June 30, 2010. *Id.* at 11-12.

Plaintiff is correct that Dr. Cherukuri, having treated him for five months at the time she wrote the assessment, was a treating source. As such, under ordinary circumstances, her opinion, if not entitled to controlling weight, would require the ALJ to provide "good reasons" for its rejection.[8] 20 C.F.R. § 404.1527(c)(2).

However, the ALJ did not err in declining to perform the treating physician analysis of the March, 2011 opinion. "'Evidence relating to a time outside the insured period is only minimally probative' to the disability determination, but . . . 'may be considered to the extent it illuminates a claimant's health before the expiration of his insured status.'" *Turski v. Commissioner of Social Sec.* 2012 WL 3020027, *9 (E.D.Mich. May 17, 2012)(citing *Nagle v. Commissioner of Social Sec.* 1999 WL 777355, *1 (6th Cir. September 21, 1999)); *Siterlet v. Sec. of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir.1987); *Higgs v. Bowen,* 880

---

[8]

"[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004)); 20 C.F.R. § 404.1527(c)(2)). Further, "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must consider "the length of the treatment relationship," "frequency of examination," "nature and extent of the treatment relationship," "supportability of the opinion," "consistency of the opinion with the record as a whole" and the source's specialization, "in determining what weight to give the opinion." *Wilson,* at 544; § 404.1527(c)(2).

F.2d 860 (6th Cir.1988).  Here, the ALJ, noting that Dr. Cherukuri did not begin treating Plaintiff until four months after the DLI,  stated her rationale for not addressing the opinion:

> "Because Dr. Cherukuri did not treat the claimant during the relevant time-frame, the undersigned will not address his medical opinion, although it should be noted that Dr. Cherukuri explicitly qualified his statements by describing the claimant when he was off his medications.  Thus, the opinion would be of limited value in any event" (Tr. 29).

Plaintiff cites *Higgs, supra,* 880 F.2d 860, 863 for the proposition that "evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time." *Plaintiff's Brief* at 11.  However, in *Higgs,* the Court found that the later created evidence was "minimally probative" of the claimant's condition prior to the expiration of benefits.  Here too, the ALJ was not required to perform a "treating physician" analysis after determining that the March, 2011 opinion was irrelevant to Plaintiff's earlier condition, particularly given the availability of Dr. Syed's records for the period under consideration.

In this case, the argument for consideration of the March, 2011 opinion is particularly weak, given that Dr. Cherukuri, who did not begin treating Plaintiff until October, 2010 (Tr. 486-487), would have no particular insight into his condition before July 1, 2010.  Plaintiff asserts that because Dr. Cherukuri  worked at the same facility as his former psychiatrist, Dr. Syed, her access to the earlier records gave her special insight into mental limitations experienced before the date last insured.  *Plaintiff's Brief* at 10.  However, the treating records contain no indication that Dr. Cherukuri had  more insight into Plaintiff's condition before the DLI than any other treater with access to her patient's former records - whether

at the same facility or elsewhere.  While Dr. Cherukuri's assessment states that the treating

relationship began in June, 2010, treating notes, both by Dr. Syed and Dr. Cherukuri, indicate

that she did not treat Plaintiff until October, 2010 (Tr. 485-487).  Finally, although Dr.

Cherukuri found that Plaintiff experienced a number of marked limitations since 1992,  this

alone provides no illumination into his condition between December 31, 2008 and June 30,

2010.

### 2.  Evidence Created Before the Onset Date of December 31, 2008.

Plaintiff also criticizes the ALJ for the following finding:

> "[T]he undersigned notes that the relevant time-frame of analysis in this case
> is from the alleged onset date in December 2008 until the date last insured
> expired on June 30, 2010.  Additionally, in regards to the evidence pertaining
> to events occurring prior to the alleged onset date, the claimant has admitted
> that he was performing full-time work between October 2008 and December
> 2008 without limitation, which renders any opinions regarding his functional
> limitations prior to that time irrelevant (Tr. 29)."

Plaintiff faults the ALJ for not finding that the October to December, 2008 work

was "a work attempt."  *Plaintiff's Brief* at 12-15.  He also argues that the ALJ erred by

declining to address Holly Harrin's January, 2007 finding that he would be unable to hold

any job.  *Id.* (citing Tr. 457).

Both arguments are without merit.  The possibility that the October through

December, 2008 work was an "unsuccessful work attempt" is foreclosed by the fact that

Plaintiff did not allege disability prior to December 31, 2008.  Unsuccessful work attempts,

as defined by 20 CFR § 404.1574(c), pertain to failed attempts to rejoin the work force after

the alleged onset of disability. *See* Programs Operations Manual System ("POMS") DI §

24005.001 ("When the work issue determination prepared by the [field officer] shows that

the claimant engaged in [substantial gainful activity] *after* the alleged onset date . . . but

subsequently ceased . . . the [field officer] will develop the facts and make a recommendation

as to whether it was an unsuccessful work attempt.")(emphasis added). The primary purpose

of finding that work activity occurring after the alleged onset date was an "unsuccessful work

attempt" rather than substantial gainful activity, "is to provide 'an equitable means of

disregarding relatively brief work attempts' that do not demonstrate sustained substantial

gainful activity." *Hays v. Apfel,* 1999 WL 450902, *6  (D.Kan.May 10, 1999)(citing SSR

84–25,1984 WL 49799).   Plaintiff did not allege that he was disabled during the time he

worked between October and December, 2008, and in fact, amended his onset of disability

to a date just after the work ended.  The ALJ did not state that Plaintiff was engaged in

"substantial gainful activity," but rather, "performing full-time work . . . without limitation"

(Tr. 29).  Because Plaintiff did not allege disability during that period, the question of

whether the work constituted substantial gainful activity is irrelevant.  Moreover, contrary

to the requirements for an unsuccessful work attempt, Plaintiff did not leave the job because

of a mental impairment.  *See* § 404.1574(c).

    Plaintiff's argument that the ALJ improperly ignored Holly Harrin's January, 2007

findings is also unavailing.  As noted by the ALJ, the one-time finding that Plaintiff

experienced severe work-related limitations has little relevance to whether he was disabled

as of December 31, 2008. Further, the ALJ reasonably noted that to the extent that Harrin's findings were entitled to any consideration, they were undermined by Plaintiff's ability to hold a job from October to December, 2008. Again, Plaintiff does not contest that the greenhouse job ended when the establishment closed for the season, rather than due to his psychological symptoms (Tr. 203).

### C. Credibility

Plaintiff also takes issue with the finding that he made "inconsistent statements" regarding his substance abuse history to various providers. *Plaintiff's Brief* at 15-20. He also argues that the ALJ erred by attributing gaps in his treatment history to lack of motivation rather than his inability to afford regular care. *Id.* at 29-36.

"[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' " *Cruse v. Commissioner of Social Sec.,* 502 F.3d 532, 542 (6th Cir.2007) (citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters,* at 531. *See also Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir.1989) ( *citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record' ").

-20-

In discounting Plaintiff's allegations of limitation, the ALJ cited several examples of inconsistent statements regarding alcohol, marijuana, and cocaine use and mis-characterizations of his legal problems (Tr. 28). Plaintiff asserts that the ALJ distorted his statements, arguing that any inconsistencies were not made to his mislead his treating sources, but instead attributable to his psychological state at the time he was being questioned. My own review of the treating records reveals that Plaintiff admitted to semi-weekly marijuana use in October, 2009 but told Dr. Syed in February, 2010 that he had experimented once with marijuana as a teenager (Tr. 300, 377). His account to Dr. Syed not only contradicts his October, 2009 statement, but also stands at odds with a January, 2007 report that he dropped acid as a teenager (Tr. 275). While Plaintiff argues that any inconsistencies in his various statements are attributable to his psychological problems, I note that almost all of these accounts contain otherwise consistent details of his family history, such as the physical abuse by his stepfather and the fact that he was traumatized by finding the body of his mother's boyfriend. Plaintiff's related contention that the ALJ had a duty to re-contact the treating sources to resolve any "ambiguity" in the record is wholly without merit, given unambiguous evidence of inconsistent statements. *Plaintiff's Brief* at 16; 20 C.F.R. § 404.1512(e).

Likewise, the ALJ permissibly discounted Plaintiff's allegations by noting gaps in his psychological treatment history. I am mindful that pursuant to SSR 96-7p, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a

failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  Contrary to Plaintiff's contention, the ALJ considered his allegations that "lack of insurance and finances" prevented regular mental health care (Tr. 29).  She permissibly rejected this claim, noting that Plaintiff "has demonstrated that he had the ability to seek emergency care" for both physical and mental issues (Tr. 29).  She observed that after Plaintiff's October, 2009 hospitalization, he was "given information regarding a free clinic to obtain his medication" (Tr. 29).  The ALJ noted that in 2010, while Plaintiff was able to keep some medication review appointments, he "missed at least 8 treatment sessions during the same period of time" (Tr. 29).  Citing Plaintiff's testimony, she observed that Plaintiff's condition was stabilized when he saw a therapist and took his medication regularly (Tr. 29).  Because the ALJ's credibility determination is well supported and explained, there is no basis for remand on this issue.

### C.  The GAF Scores

Plaintiff argues that the ALJ erred by discounting the import of GAF scores showing significant occupational or functional limitations.  *Plaintiff's Brief* at 20-24.  Specifically, he objects to the ALJ's finding that the GAF of 35-40 assigned  in October, 2009 and the GAF of 40 in February, 2010 were not indicative of his long-term functioning.  *Id.* at 21 (citing Tr. 30).

-22-

A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *White v. Commissioner of Social Sec.,* 572 F.3d 272, 276 (6th Cir. 2009)(citing *Edwards v. Barnhart,* 383 F.Supp.2d 920, 924 fn 1 (E.D.Mich.2005)).  "A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues. *Oliver v. Commissioner of Social Sec.* 415 Fed.Appx. 681, 684, 2011 WL 924688, *4 (6th Cir. March 17, 2011)(citing *White,* 572 F.3d at 284). "'The GAF scale ... does not have a direct correlation to the severity requirements in [the regulations'] mental disorders listings.'"*Oliver,* at *4 (citing 65 Fed.Reg. 50746, 50764–65 (2000)).  *See also Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 511, 2006 WL 305648, *13 (6th Cir. February 9, 2006)(citing *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002))("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place").

The ALJ did not err in giving little weight to the GAF scores.  She noted that the October, 2009 GAF score of 35 assigned at the time of Plaintiff's psychiatric admission, but observed that upon discharge four days later, he felt "excellent" (Tr. 30, 316).  The ALJ noted that following the discharge, Plaintiff sought followup treatment on only one occasion in December, 2009 (Tr. 30).  The ALJ also noted that while Sally Glowicki, a prospective

counselor, and Dr. Syed gave Plaintiff a GAF of 40 in January and February, 2010 respectively, Plaintiff reported to Dr. Syed in March, 2010 that he was feeling better (Tr. 30). The ALJ also noted that Plaintiff failed to attend any therapy sessions scheduled for February, 2010 (Tr. 30). She also found that the GAF of 40 did not reflect Dr. Syed's treating records from March, 2010 showing that Plaintiff's symptoms were stabilized with medication and treatment (Tr. 30). Because the minimal weight accorded the scores is well supported by Sixth Circuit case law and the reasons stated on the record, there is no basis for a remand on this issue.

### D. The Hypothetical Question/RFC

Plaintiff argues that neither the hypothetical question to the VE nor the essentially identical RFC accounted for his moderate deficiencies in concentration, persistence, or pace ("CPP") as found in the ALJ's opinion. *Plaintiff's Brief* at 24-29. He also argues that the hypothetical question did not account for the "psychological symptom of stress" that he experienced in "any work setting" *Id.* at 26. He asserts that the ALJ "also failed to discuss or take into consideration [his] numerous attempts to work," including a work stint that ended in April, 2009.[9] *Id.* at 25. He argues that Dr Cherukuri's finding of "marked" limitations in

---

[9]

In making her Step Four finding that Plaintiff could return to her former work, the ALJ was permitted but not required to use the VE. *Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987); *See also Mays v. Barnhart,* 78 Fed. Appx. 808, 813–814 (3rd Cir.2003) ("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ"). A hypothetical question's deficiencies, with nothing more, would not invalidate a Step Four finding that a claimant could perform his former work. However here, because the ALJ explicitly stated that the Step

-24-

concentration, persistence, or pace ought to have been adopted by the ALJ. *Id.* at 28.

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec*. 368 F.3d 629, 632 (6th Cir. 2004).

Moderate deficiencies in CPP suggest substantial limitations which must be acknowledged in the hypothetical question. *Edwards v. Barnhart,* 383 F.Supp.2d 920, 931 (E.D.Mich.2005) (Friedman, J.). The failure to account for moderate deficiencies in CPP in the hypothetical question constitutes reversible error. However, the evidence of record and the ALJ's opinion must be considered in their entirety in determining whether the hypothetical limitations adequately describe the claimant's limitations. *Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824, *11 (E.D.Mich.2011)("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations)(citing *Hess v. Comm'r of Soc. Sec.,* No. 07–13138, 2008 WL 2478325, at *7 (E.D.Mich. 2008)). An ALJ is not required to include the phrase "moderate deficiencies in

_____

Four conclusion was based on the VE's testimony (Tr. 31), material deficiencies in the hypothetical question would constitute reversible error consistent with a Step Five determination.

concentration, persistence, and pace" or other talismatic language in the hypothetical. *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir.2001); *Webb, supra,* 368 F.3d at 633.

The ALJ's choice of hypothetical limitations is supported by substantial evidence. Although Plaintiff asserts that the ALJ did not adequately address his concentrational problems as a result of workplace anxiety, the hypothetical limitations were based on either his testimony or statements to Dr. Syed. While Plaintiff cites SSR 88-15p for the proposition that even "low stress" jobs create anxiety for an individual afraid of dealing with the public, the ALJ limited him to "low stress work" *and* jobs with "no interaction with the public" (Tr. 26). Likewise, the ALJ adopted Plaintiff's testimony that he experienced anxiety that he was not doing his job correctly (Tr. 72, 74-75) by limiting him to jobs where he would receive periodic assurances from his supervisor (Tr. 80). I note that the choice of hypothetical limitations is also supported by Plaintiff's September, 2010 statement to Dr. Syed that he could "handle a job if he [was] by himself" (Tr. 485).

The ALJ sufficiently addressed Plaintiff's moderate concentrational limitations by restricting him to "non-production oriented" and "simple, unskilled work" (Tr. 80). Having tailored the hypothetical modifiers to Plaintiff's own restrictions, she was not required to include the term "moderate deficiencies in concentration, persistence, or pace" verbatim to account for all of his limitations. *See Smith, supra,* at 379 ("the ALJ went beyond [a] simple frequency assessment to develop a complete and accurate assessment of Smith's mental

impairment," by including "restrictions against quotas, complexity, stress, etc." in the hypothetical question).

Plaintiff's argument that the ALJ did not consider his failed work attempts in crafting the RFC is also without merit. *Plaintiff's Brief* at 25. First, as discussed above in Section **A.2.,** Plaintiff's work activity between October and December, 2008 did not constitute an unsuccessful work attempt. Second, the ALJ explicitly stated that work performed in February and April of 2009 was an unsuccessful work attempt (Tr. 23). Plaintiff's peripheral argument that the hypothetical question ought to have included Dr. Cherukuri's finding of *marked* concentrational limitations, the reasons for declining to consider the psychiatrist's findings are well explained. *See* Section **A.1.,** above. Accordingly, the ALJ was not required to include Dr. Cherukuri's findings in the hypothetical limitations or RFC. *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118-119 (6th Cir.1994)(ALJ not obliged to include discredited findings in the hypothetical question).

## E.  The Report by Plaintiff's Fiancée

Finally, Plaintiff argues that the ALJ erred by rejecting his fiancée's March, 2010 assessment of his functional limitations. *Plaintiff's Brief* at 36-37. He challenges the ALJ's rejection of Ms. Stellmacher's opinion, taking issue with the ALJ's finding that Ms. Stellmacher's opinion was not well explained. *Id.* at 36 (citing Tr. 31, 159-162). He asserts that "[a]ll lay testimony and statements would be incompetent under the standard adopted in the ALJ['s] decision." *Id.*

-27-

Pursuant to SSR 06-3p, the ALJ may consider evidence from non-medical sources such as neighbors and clergy members "to show the severity of . . . impairments." 2006 WL 2329939, *2 (2006). 2006 WL 2329939, *2 (2006); 20 C.F.R. § 404.1513(d)(4).  While generally, the ALJ is entitled to determine what weight to give to "other source," evidence, "[p]erceptible weight must be given to lay testimony where . . . it is fully supported by the reports of the treating physicians." *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).

The ALJ's discussion of Ms. Stellmacher's opinion speaks for itself:

> "Ms. Stellmacher opined that the claimant's impairments cause him difficulties with bending, memory, completing tasks, concentration, following instructions, and getting along with others.  However, Ms. Stellmacher did not provide an explanation for why his impairments cause difficulties in these areas of functioning.  The undersigned gives this opinion little weight to the extent it differs from the [RFC] as set forth above because it is not accompanied by an adequate basis of support for consideration" (Tr. 31).

Contrary to Plaintiff's contention, the ALJ did not reject all of Ms. Stellmacher's assessment, but only "to the extent it differs from the [RFC]" (Tr. 31).  For example, her statement that Plaintiff required encouragement to stay on task is similar to the hypothetical limitation that "if necessary, this individual could receive assurances from supervision that the job was being performed right" (Tr. 80).  While Plaintiff alleged that he experienced anxiety at work and in public, Ms. Stellmacher's statement that Plaintiff experienced memory and concentrational problems is contradicted by treating records showing that Plaintiff's memory and concentration were unimpaired (Tr. 164, 479).  Likewise, her statement that

Plaintiff experienced trouble bending stands at odds with his ability to work as a horticulture worker without complaints of physical symptoms (Tr. 164). Accordingly, the ALJ did not err in discounting the portions of Ms. Stellmacher's statements that contradicted the RFC.

Notwithstanding the many arguments exhaustively briefed by Plaintiff, the ALJ did not err in finding that Plaintiff was not disabled. In particular, Plaintiff's acknowledgment that he could work at a job where he could work by himself (Tr. 485) soon after the expiration of benefits and Dr. Syed's treating notes from the same period showing that his condition improved when he was receiving treatment strongly support the non-disability determination (Tr. 479, 482, 485). Because the decision that Plaintiff was not disabled as of June 30, 2010 falls within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## <u>CONCLUSION</u>

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140,

106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: February 27, 2013

**CERTIFICATE OF SERVICE**

I hereby certify on February 27, 2013, I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on February 27, 2013: **None**

s/Terri L. Hackman

Judicial Assistant to

Magistrate Judge R. Steven Whalen

(313) 234-5115